IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PHILIP YOUTIE                                  :        CIVIL ACTION
                                               :
          v.                                   :
                                               :
MACY'S RETAIL HOLDING, INC., and               :        NO.  07-3182
MACY'S, INC.                                   :


O'NEILL, J.                                              SEPTEMBER 10, 2009


<u>MEMORANDUM</u>

At issue here are defendants' Macy's Inc. (Macy's)[1] and Macy's Retail Holdings, Inc.

(Macy's Retail)[2] remaining counterclaims and requests for damages and equitable relief with

regard to plaintiff Philip Youtie's alleged acquisition and disclosure of the relevant first cost

data.  Defendants' counterclaims include misappropriation of trade secrets and/or confidential

and proprietary information, breach of fiduciary duty and duty of loyalty, unjust enrichment,

unfair competition, and violations of the Pennsylvania Uniform Trade Secrets Act (PUTSA), 12

Pa. Cons. Stat. Ann. § 5301, <u>et seq.</u> (2004).  Presently before me are defendants' second motion

for summary judgment on their counterclaims and requests for relief (D. No. 68) and plaintiff's

response thereto, plaintiff's second motion for summary judgment on defendants' counterclaims

---

[1]  Defendants have had various corporate names during the periods relevant to this litigation.  Macy's was The May Department Stores Company, May DE at the time it acquired David's Bridal's shares and the agreement was signed with plaintiff.  It was later referred to as Federated Department Stores, Inc. and then became Macy's, Inc.  For this reason, regardless of its name at the time of the incident discussed, I will refer to this defendant as Macy's.

[2]  Defendant Macy's Retail was The May Department Stores Company, May NY at the time it signed the agreement with plaintiff.  It was later referred to as Federated Retail Holding, Inc. and then became Macy's Retail Holdings, Inc.  For this reason, regardless of the time of the incident discussed, I will refer to this defendant as Macy's Retail.

and requests for relief (D. No. 74) and defendants' response thereto, and the supporting and supplemental briefing.

BACKGROUND

I.   Procedural History

On August 3, 2007, plaintiff Philip Youtie filed a complaint against defendant Macy's alleging a breach of plaintiff's employment agreement and violations of the Pennsylvania Wage Payment and Collection Law (WPCL), 43 P.S. § 260.1, et seq.  On December 17, 2007, Macy's filed an answer, affirmative defenses and counterclaims seeking damages and injunctive relief and alleging that plaintiff breached his employment agreement, misappropriated trade secrets and/or confidential and proprietary information, breached his fiduciary duty and duty of loyalty, engaged in tortious interference with business and employment relations, was unjustly enriched and engaged in unfair competition.  On August 19, 2008, plaintiff filed an answer to Macy's counterclaims.  On March 26, 2009, plaintiff filed an amended complaint against defendants alleging the same claims and adding Macy's Retail as an additional defendant.  Defendants filed their answer to the amended complaint, affirmative defenses and identical counterclaims against plaintiff on April 15, 2009.  On May 5, 2009, plaintiff filed his answer to defendants' counterclaims.

The parties filed their first cross-motions for summary judgment in the autumn of 2008. On June 5, 2009, I ruled on the motions as follows:  (1) I granted defendants' and denied plaintiff's motion for summary judgment on plaintiff's breach of contract and WPCL claims and entered judgment for defendants and against plaintiff on that claim; (2) I granted plaintiff's and denied defendants' motion for summary judgment on defendants' counterclaims of breach of

contract, breach of fiduciary duty and duty of loyalty and tortious interference with business and employment relations with respect to plaintiff's introduction of David's Bridal employee Linda Shaps-Shanin to Steven Erlbaum; (3) I granted defendants' and denied plaintiff's motion for summary judgment on defendants' counterclaim of breach of contract for plaintiff's request for and disclosure of the first cost data; (4) I denied without prejudice plaintiff's and defendants' motion for summary judgment on defendants' counterclaims of misappropriation of trade secrets and/or confidential and proprietary information, breach of fiduciary duty and duty of loyalty, unjust enrichment and unfair competition with regard to plaintiff's request for and disclosure of "first cost" data and allowed defendants to file an amended counterclaim complaint adding a claim under the PUTSA; (5) I allowed the parties to file motions for summary judgment thereafter; and (6) I denied without prejudice plaintiff's motion for summary judgment on defendants' request for injunctive relief.

On June 20, 2009, defendants filed an amended counterclaim complaint to also include a claim under the PUTSA. Defendants filed their second motion for summary judgment on their counterclaims on June 20, 2009 and plaintiff filed his second cross-motion for summary judgment on July 7, 2009. These cross-motions are currently pending before me. On June 23, 2009 I ordered the parties to file supplemental briefing to address specific issues related to defendants' counterclaims that were not fully briefed in the motions.[3] On July 14, 2009, plaintiff filed his answer to defendants' amended counterclaim. Plaintiff filed his supplemental briefing on July 13, 2009 and defendants filed their supplemental briefing on July 20, 2009. David's

_____

[3] I would like to note that despite numerous requests for re-briefing and emphasis on the need to provide legal authority in the re-briefing the legal authority provided in the briefs was disappointingly minimal.

Bridal moved to intervene in defendants' counterclaims and I denied this request on August 31, 2009.

II.     Factual History

Defendants, corporations based in New York and Delaware, argue that the conduct of plaintiff, a Florida citizen, during his employment gave rise to their causes of action against him.

On August 1, 2000, Macy's acquired all of the publicly-held shares of David's Bridal. David's Bridal is a corporation and a clothier specializing in bridal gowns and other formal wear and accessories. Plaintiff had purchased David's Bridal in 1972, expanded the operations, partnered with Steven Erlbaum beginning in 1989 or 1990 and with Erlbaum made a public offering of David's Bridal's stock in 1999. After Macy's acquired David's Bridal, on or about October 1, 2001, plaintiff entered into a contract of employment with a division of Macy's, Macy's Retail. In accordance with the terms of the agreement, plaintiff served as the Executive Vice-President, Product Development and Sourcing of the David's Bridal division of Macy's Retail. On November 17, 2006, an affiliate of Leonard Green & Partners signed an agreement with Macy's to acquire David's Bridal. The sale and transfer of stock of David's Bridal to the Leonard Green affiliate was consummated on January 31, 2007. As part of the transaction, Macy's subsidiary Macy's Retail assigned its employment agreement with plaintiff to David's Bridal. This assignment provided the basis for plaintiff's breach of contract and WPCL claims on which I entered judgment in favor of defendants in my June 5, 2009 Order.

David's Bridal sent plaintiff a letter terminating his employment as Executive Vice President "for cause" on February 27, 2007 based upon his allegedly competitive and disloyal conduct that is the basis of defendants' counterclaims.

4

Defendants claim that, in late 2006, plaintiff asked Linda Shaps-Shanin, Vice President and General Merchandising Manager of David's Bridal, for first cost data involving the costs incurred by the company to manufacture its bridal dresses and gowns.  It is further alleged that, despite being denied access to this information, plaintiff renewed his request for such information to Shaps-Shanin and her assistant Sharon Zuk in January 2007 but was again denied.  Plaintiff denies that he asked Shaps-Shanin or Zuk for the first cost data.  However, plaintiff admits that he obtained the first cost data on the dresses in David's Bridal's Spring 2007 catalogue from Lydia Chow, an employee of Fillberg LTD, David's Bridal's Hong Kong marketing representation, during a business trip to Hong Kong in January 2007 with David's Bridal employees.  Plaintiff admits that when he asked Chow for the first cost data that he told her he wanted the information to "make sure that the costs were in line at that time."  Plaintiff does not dispute that the first cost data at issue is the cost the manufacturers charged David's Bridal to manufacture the designs David's Bridal provided the manufacturers for its Spring 2007 catalogue.  Additionally, plaintiff admitted in his affidavit that he "asked for the [first] cost data because [] Erlbaum . . . was interested in what David's Bridal paid various manufacturers for the dresses they manufactured."

Plaintiff further admits that he gave a copy of the cost sheet to Erlbaum.  However, whether plaintiff provided the first cost data to Erlbaum while still employed by Macy's Retail, after his agreement was assigned to David's Bridal or after he was terminated by David's Bridal is uncertain.  Defendants claim that plaintiff provided conflicting testimony regarding the timing of the disclosure.  He stated:  (1) in his June 2008 deposition testimony that he did not know when he disclosed the first cost data to Erlbaum; (2) in his December 29, 2008 response to

5

defendants' partial motion for summary judgment that, although he did not recall exactly when he provided the first cost data to Erlbaum, he recalls that he disclosed it after he recovered from his January 2007 surgical procedure which would have been some time in February 2007 when he was employed by David's Bridal; and (3) in his July 14, 2009 answer to defendants' counterclaim that he did not disclose the information "until after his employment with David's Bridal was terminated on February 27, 2007."

Plaintiff also admits that he and his former partner Erlbaum had general discussions about Erlbaum returning to the bridal clothier business. However, he states that no specifics were discussed and that neither had plans to enter into a business in competition with David's Bridal. In his deposition on June 4, 2008, plaintiff testified that, during the period in which he was still employed by David's Bridal, he and Erlbaum discussed starting a business in "direct competition" with David's Bridal but that no specifics were discussed. However, in his December 2008 affidavit, plaintiff claimed that the potential business discussed was "a wholesale dress manufacturing business in an off-shore location" that "would not compete in any way with David's Bridal."

Additionally, plaintiff admits that he introduced Shaps-Shanin to Erlbaum on January 29, 2007 but claims that he did so at her request. He also admits that, after this meeting, he asked Shaps-Shanin for a copy of her employment agreement but claims that she refused to give it to him. Although Shaps-Shanin asserted that Erlbaum "attempted to convince [her] to join [him] in a competing bridal business," plaintiff argues that it is uncontroverted that Erlbaum never established any type of business and that Shaps-Shanin never left David's Bridal's employ. Defendants dispute that Shaps-Shanin in any way instigated her introduction to Erlbaum.

6

Section 6(a) of the Employment Agreement prohibited plaintiff "at any time, directly or indirectly, [from] us[ing] or disclos[ing] any of May's [aka Macy's Retails'] Confidential Information except as authorized and within the scope of [his] employment with May [aka Macy's Retail.]"  Section 6(d) defines Confidential Information as:

> any non-public information pertaining to May's business.  Confidential Information includes information disclosed by May to you, and information developed or learned by you during the course of or as a result of your employment with May, which you also agree is May's property . . . .  Confidential Information includes, without limitation, information and documents concerning May's processes, suppliers (including May's terms, conditions and other business arrangements with suppliers); supplier and customer lists; advertising and marketing plans and strategies; profit margins; seasonal plans, goals, objectives and projections; compilations, anaylses and projections regarding May's divisions, stores, product segments, product lines, suppliers, sales and expenses; files; trade secrets and patent applications (prior to their being public); salary, staffing and employment information (including information about performance of other executives); and "know-how," techniques or any technical information not of a published nature relating, for example, how May conducts its business.

The agreement also contained a non-compete clause for conflicts of interest constraining plaintiff with the following language:

> **5.  Avoiding Conflict of Interest.**  (a) At all times while you are employed by May and for one year after your employment terminates, you will not directly or indirectly:
>
> (i) own, manage, operate, finance, join, control, advise, consult, render services to, have an interest or future interest in or participate in the ownership, management, operation, financing or control of, or be employed by or connected in any manner with any Competing Business;
>
> (ii) solicit for employment, hire or offer employment to, or otherwise aid or assist (by disclosing information about employees or otherwise) any person or entity other than David's Bridal, May or another May subsidiary in soliciting for employment, hiring or offering employment to, any employee of David's Bridal, May or another May subsidiary; or
>
> (iii) take any action which is intended to harm David's Bridal or May or

7

either of their reputations, or that David's Bridal or May reasonably concludes
could harm David's Bridal or May or their reputations or lead to unwanted or
unfavorable publicity for David's Bridal or May.

STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is
proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show
that there is no genuine issue as to any material fact and that the movant is entitled to judgment
as a matter of law." An issue of material fact is genuine if "the evidence is such that a reasonable
jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 255 (1986). Summary judgment will be granted "against a party who fails to make a
showing sufficient to establish the existence of an element essential to that party's case, and on
which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317,
322 (1986). The party moving for summary judgment has the burden of demonstrating that there
are no genuine issues of material fact. Id. at 322-23. If the moving party sustains the burden, the
nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial. See
Anderson, 477 U.S. at 255.

When a properly supported motion for summary judgment is made, "an adverse party
may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse
party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts
showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The adverse party must
raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary
judgment motion and cannot survive by relying on unsupported assertions, conclusory
allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir.

1989).  However, the "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against [the moving party]."  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978), citations and quotation marks omitted.

DISCUSSION

Defendants seek summary judgment on their PUTSA counterclaims and their common law counterclaims of misappropriation of trade secrets and/or confidential and proprietary information, breach of fiduciary duty and duty of loyalty, tortious interference with business and employment relations, unjust enrichment and unfair competition with regard to plaintiff's alleged acquisition and disclosure of the relevant first cost data.[4]  Plaintiff filed a cross-motion for summary judgment on defendants' counterclaims.  Plaintiff argues that defendants' common law counterclaims are preempted by defendants' PUTSA counterclaims.  Additionally, plaintiff argues that defendants' PUTSA counterclaims fail on the merits.  The parties also dispute the type of relief available to defendants.

I.      PUTSA Trade Secret and Preemption

As I found in my June 5, 2009 Memorandum if the first cost data is found to be a trade secret under the PUTSA defendants' common law counterclaims are preempted.  Youtie, 626 F. Supp. 2d at 522-23 (E.D. Pa. 2009).  Defendants concede that their common law counterclaims are preempted under the PUTSA if the first cost data is a trade secret.  Plaintiff argues that defendants' common law claims (Counts 3-7) are preempted and defendants may proceed under the PUTSA (Count 8) only, but does not explicitly concede that the first cost data is a trade secret

_____

[4]  As I previously found, Pennsylvania law applies to defendants' PUTSA counterclaims. Youtie v. Macy's Retail Holding, Inc., 626 F. Supp. 2d 511, 521 (E.D. Pa. 2009).

9

under the PUTSA.[5]

The relevant section of the PUTSA provides as follows:

**(a) General rule.--**Except as provided in subsection (b), this chapter displaces conflicting tort, restitutionary and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret.
**(b) Exceptions.**--This chapter does not affect:
    (1) contractual remedies, whether or not based upon misappropriation of a trade secret;
    (2) other civil remedies that are not based upon misappropriation of a trade secret; or
    (3) criminal remedies, whether or not based upon misappropriation of a trade secret.

12 Pa. C.S.A. § 5308.  The dominant view of courts in states that have also adopted the Uniform

Trade Secrets Act of 1985 is that preemption exists to the extent that defendants' counterclaims

are based on the same conduct that is said to constitute a misappropriation of trade secrets.  See,

e.g., Motorola, Inc. v. Lemko Corp., 2009 WL 383444, at *10 (N.D. Ill. Feb. 11, 2009); Hecny

Trans., Inc. v. Chu, 430 F.3d 402, 404-05 (7th Cir. 2005); Penalty Kick Mgmt. Ltd. v. Coca Cola

Co., 318 F.3d 1284, 1296-98 (11th Cir. 2003); Savor, Inc. v. FMR Corp., 812 A.2d 894 (Del.

2002).  As discussed in my June 5, 2009 Memorandum, defendants' counterclaims for

misappropriation of trade secrets and/or confidential and proprietary information, breach of

fiduciary duty and duty of loyalty, unjust enrichment and unfair competition involve the same

first cost data and the same conduct by plaintiff of requesting the first cost data and disclosing it

---

[5] Plaintiff again attempts to argue that the PUTSA preempts defendants' counterclaims but does not concede that the information qualifies as a trade secret under the PUTSA.  As I noted in my June 5, 2009 Memorandum, these arguments "are contradictory; plaintiff cannot have it both ways."  Youtie, 626 F. Supp. 2d at 523, citing Callaway Golf Co. v. Dunlop Slazenger Group Am., Inc., 295 F. Supp. 2d 430, 437 (D. Del. 2003), stating that arguing that information does not constitute a trade secret and also that other claims are preempted by the Trade Secret Act is contradictory.

to Erlbaum as defendants' PUTSA counterclaims for misappropriation of a trade secret.  Youtie,

626 F. Supp. 2d at 521.  Thus, as the claims are based on the same conduct, defendants' common

law counterclaims are preempted if the first cost data at issue constitutes a trade secret.

> A trade secret under the PUTSA is defined as:
>
> Information, including a formula, drawing, pattern, compilation including a costumer list, program, device, method, technique or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

PUTSA, 12 P.S. § 5302.  To constitute a "trade secret" under PUTSA, it must be an actual secret

of peculiar importance to the business and constitute competitive value to the owner.  Parsons v.

Pa. Higher Educ. Assistance Agency, 910 A.2d 177, 185 (Pa. Cmwlth. Ct. 2006), appeal denied

591 Pa. 686.  The "crucial indicia for determining whether certain information constitutes a trade

secret are 'substantial secrecy and competitive value to the owner.'"  O.D. Anderson, Inc. v.

Cricks, 815 A.2d 1063, 1070 (Pa. Super. Ct. 2003), citations omitted.  Some additional factors

for a court to consider in determining whether given information is a trade secret are:  (1) the

extent to which the information is known outside of the owner's business; (2) the extent to which

it is known by employees and others involved in the owner's business; (3) the extent of measures

taken by the owner to guard the secrecy of the information; (4) the value of the information to the

owner and to his competitors; (5) the amount of effort or money expended by the owner in

developing the information; and (6) the ease or difficulty with which the information could be

properly acquired or duplicated by others.  Id., citing SI Handling Sys., Inc. v. Heisley, 753 F.2d

1244, 1255-56 (3d Cir. 1985), citations omitted; <u>Amerisourcebergen Drug Corp. v. Am. Assoc.</u>

<u>Druggists, Inc.</u>, 2008 WL 248933, at *18-19 (E.D. Pa. Jan. 29, 2008); <u>Iron Age Corp. v. Dvorak</u>,

880 A.2d 657, 663 (Pa. Super. Ct. 2005).[6]

Courts have found "trade secrets" to include "certain business and marketing information

including the costing and pricing information of an employer's product or services, an

employer's business plans, marketing strategies, and financial projections and the terms of

specific customer accounts including contract expiration dates and revenues generated." <u>BIEC</u>

<u>Intern., Inc. v. Global Steel Services, Ltd.</u>, 791 F. Supp. 489, 545 (E.D. Pa. 1992), <u>citing</u> <u>SI</u>

<u>Handling</u>, 753 F.2d at 1260, protecting cost and pricing information for the final product; <u>Union</u>

<u>Carbide Corp. v. UGI Corp.</u>, 731 F.2d 1186, 1191 (5th Cir. 1984), applying Pennsylvania law to

protect marketing information and strategies; <u>Air Products and Chemicals, Inc. v. Johnson</u>, 442

A.2d 1114, 1121 (Pa. Super. Ct. 1982), protecting business plans and financial projections;

<u>Alexander & Alexander, Inc. v. Drayton</u>, 378 F. Supp. 824, 833 (E.D. Pa.), aff'd, 505 F.2d 729

(3d Cir. 1974), protecting the terms of specific customer accounts.  "Customer lists and

confidential business information cannot be trade secrets if they are easily or readily obtained,

without great difficulty, through some independent source other than the trade secret holder."

---

[6]  As I noted in my June 5, 2009 Memorandum, the PUTSA displaced Pennsylvania's common law tort for misappropriation of trade secrets, but there is no indication that the statute effected a substantive shift in the definition of "trade secret."  The common-law definition, like the statutory one, provided for protection for a formula, pattern, device, or compilation of information and required that the information be kept secret and provide a competitive value to the owner.  <u>Pestco, Inc. v. Assoc. Prod., Inc.</u>, 880 A.2d 700, 706 (Pa. Super. Ct. 2005).  The conclusion that the PUTSA did not substantially alter the definition of "trade secret" is supported by post-PUTSA cases that rely on common law in determining whether certain information rises to the level of a trade secret.  <u>See, e.g.</u>, <u>Parsons v. Pa. Higher Educ. Assistance Agency</u>, 910 A.2d 177, 185-86 (Pa. Commw. Ct. 2006); <u>Select Med. Corp. v. Hardaway</u>, 2006 WL 859741, at *8 (E.D. Pa. 2006); <u>Brubaker Kitchens, Inc. v. Brown,</u> 2006 WL 1193223, at *1-2 (E.D. Pa. 2006).

BIEC Intern., 791 F. Supp at 545, citations omitted.  A compilation of data that has independent

economic value can be protected as a trade secret.  Amerisourcebergen Drug Corp. v. Am.

Associated Druggists, Inc., 2008 WL 248933, at *25 (E.D. Pa. Jan. 29, 2008), citing Nat'l. Risk

Mgmt., Inc. v. Bramwell, 819 F .Supp. 417, 430-31 (E.D. Pa. 1993), holding that customer

information, such as costing and price information, compiled by a business represents a material

investment of time and money and constitutes a valuable asset; Morgan's Home Equip. Corp. v.

Martucci, 136 A.2d 838, 842-43 (Pa. 1957), holding that customer data on, and confidential route

of, door-to-door salesmen's customers were entitled to protection as trade secrets.

I must therefore determine whether the first cost data at issue in this litigation represents

simple pricing information possessed by third parties or a significant compilation possessed and

protected by defendants.[7]  The first cost data was a list of the manufacturing costs of the gowns

and accessories in David's Bridal's Spring 2007 Bridal Catalog (approximately 140 items)

manufactured by the factories to David's Bridal's design specifications and exclusively for

David's Bridal.  The information at issue was not merely the costs that the factory charges for its

materials that go into its customer's products; the information involved the bargained-for costs

that the factories charged to manufacture David's Bridal's specific designs.

Defendants argue that the data is known only to a few individuals within the David's

Bridal organization and Fillberg, the company that acts as its exclusive agent for the purchase of

bridal garments, and that is not known outside of those individuals within the companies.  Chow

---

[7]  Although this discussion will reference David's Bridal's actions in protecting this
information, it is in the context of David's Bridal's capacity as a subsidiary of defendants only.
This discussion in no way considers how David's Bridal may have protected the information
when it was no longer a subsidiary of defendants.

has stated that, while an employee or a retail buyer might know some of the information on costs

for specific styles of dresses because the costs for those dresses might be discussed in the context

of an actual purchase order, few if any employees know the first cost data for the entire Spring

2007 line.

Additionally, defendants had taken steps to protect this data.  They required that Fillberg

agree to a specific and comprehensive ethics policy requiring all representatives to protect each

of the styles and designs originated by David's Bridal as well as the pricing, sourcing and product

development.  Specifically, the ethics policy prohibits Fillberg employees from disclosing "any

information including but not limited to styles, suppliers, prices, raw material, design, buying

methods, general sourcing policy . . . to a third party without a written approval from the

management."  In turn, Fillberg required that each supplier and manufacturer execute a

confidentiality and exclusivity agreement with David's Bridal to protect the information

regarding the designs and related issues.  Fillberg claims that it enforces these confidentiality

obligations by terminating relationships with factories that do not maintain strict confidentiality

regarding the design, pricing and related confidential information.

The first cost data had value to defendants.  Plaintiff acquired the first cost data for the

entire Spring 2007 Bridal catalog.  Included in the first cost data is the cost of the raw material,

labor and other costs for each design produced in each factory.  It would be difficult for a single

individual to replicate the data represented by this information because it would require

contacting many factories in Asia and defendants claim that they had "invested millions of

dollars over the years to procure these designs and perfect the relationships to manufacture these

product lines."  The first cost data represented in this litigation was of significant value because

14

the dresses in the Spring 2007 catalog were being sold during the time at issue and the

"negotiated costs for the dresses" required factories to produce them at the set price for the life of

the garment design, which can exceed 5-7 years.  Additionally, this information would have been

valuable to a competitor or potential competitor of defendants.  With the first cost data and the

publicly-available retail costs, a competitor could have determined defendants' past and current

profit margins and used it to gain a competitive advantage.

Plaintiff does not dispute any of defendants' statements as to the value of the first cost

data, the content of the first cost data or how it was protected by defendants and Fillberg.  He

notes without rearguing that I previously rejected his argument that the information was available

to the public and found that the data was "confidential information" under the employment

agreement and that the PUTSA's definition of a trade secret is "identical" to that of "confidential

information" under the employment agreement.  However, he "again assert[s]" that trade secret

status is not accorded to information such as material sources and costs "that would be learned in

any productive industry" and therefore "plaintiff has no right to protect the costs it pays to

suppliers as proprietary."  N3 Oceanic, Inc. v. Shields, 2006 WL 2433731, at *8 (E.D. Pa. Aug.

21, 2006), citing Van Prods. Co. v. Gen. Welding & Fabrication Co., 213 A.2d 769, 776 (Pa.

1965).[8]  Although plaintiff makes the legal argument that the costs defendants pay to suppliers

---

[8]  Although the case cited by plaintiff supports his legal argument, the facts in this case
are distinguishable.  In N3 Oceanic, the information at issue was easily available because the
"prices are already well known to third parties-the vendors" and some was financial information
that the company was required to disclose in its public financial statements.  N3 Oceanic, 2006
WL 2433731, at *8.  However, the first cost data at issue here was protected with confidentiality
agreements and it would require substantial effort to determine the information for each dress
style independently.  Additionally, while the sources and material costs for each factory may be
obtainable, the first cost data at issue was the cost of the finished products which consisted of
David's Bridal's designed and included the cost at which David's Bridal had bargained with each

would not constitute trade secrets, he provides no evidence to refute defendants' evidence that the substance of the first cost data is more than mere costs paid to suppliers.  Despite making this argument, plaintiff states that he "respectfully suggest[s] that the claims of [d]efendants in this regard must therefore be examined in the context of PUTSA and [d]efendants['] common law claims [] must be dismissed as being preempted by PUTSA."

Additionally, he argues that the issue of whether certain information constitutes a trade secret is a question of fact to be resolved by the jury or the trier of fact.  However, where there is no genuine issue of material fact in dispute the court may find that information is a trade secret protected by the PUTSA.  Camelot Technology, Inc. v. RadioShack Corp., 2003 WL 403125, at *5 (E.D. Pa. 2003), holding that while "[t]he question of whether certain information constitutes a trade secret is a question of fact to be resolved by the jury or the trier of fact[,] factual issues are subject to summary judgment whenever the law as applied to uncontroverted facts shows that the movant is entitled to summary judgment," citations omitted; see also Amerisourcebergen Drug, 2008 WL 248933, at *25; B & B Microscopes v. Armogida, 532 F. Supp. 2d 744, 755-57 (W.D. Pa. 2007); Omicron Systems, Inc. v. Weiner, 860 A.2d 554, 562 (Pa. Super. Ct. 2004).  As discussed above, plaintiff fails to dispute any of the evidence defendants have presented to create a genuine issue of material fact.

Thus, I find that the first cost data at issue in this litigation represents a significant compilation of information subject to protection by defendants and fulfills the requirements of a

---

factory.  See SI Handling, 753 F.2d at 1260, distinguishing between simple pricing information and the "costing and pricing information" for the plaintiff's finished product, which involved "a whole range of data relating to materials, labor, overhead, and profit margin, among other things."

trade secret under the PUTSA.  I will therefore find that the first cost data constitutes a trade secret and dismiss defendants' common law counterclaims (Counts 3-7) as preempted by the PUTSA.

## II.    Misappropriation under the PUTSA

As I have determined that the first cost data constitutes a trade secret under the PUTSA, I must examine defendants' counterclaims under the PUTSA that plaintiff misappropriated the first cost data.  Plaintiff argues that defendants have not adequately stated a claim under the PUTSA for misappropriation of a trade secret.  Defendants argue that they have causes of action for misappropriation under both acquisition and disclosure.

The PUTSA creates a statutory cause of action for injunctive relief, compensatory damages and exemplary damages for the actual loss caused by misappropriation of trade secrets and the unjust enrichment caused by such misappropriation.  12 Pa. C.S.A. §§ 5303-4. "Misappropriation" is defined to include:

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) disclosure or use of a trade secret of another without express or implied consent by a person who:
> > (i) used improper means to acquire knowledge of the trade secret;
> > (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
> > > (A) derived from or through a person who had utilized improper means to acquire it;
> > > (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> > > (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> > (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12 Pa. C.S.A. § 5302.  Plaintiff argues that defendants' counterclaims fail under the PUTSA

because they have not adequately shown misappropriation.  Specifically, plaintiff claims that

defendants argue misappropriation only through disclosure and that the disclosure claim fails.[9]

However, defendants allege counterclaims under the PUTSA for misappropriation by acquisition

and disclosure.[10]  Defendants argue that their PUTSA counterclaims succeed because plaintiff

admitted at his deposition that he obtained the first cost data under false pretenses and disclosed

it to a third-party who was making plans to compete with David's Bridal.

    A.    <u>Misappropriation by Acquisition</u>

Defendants argue that their counterclaims under the PUTSA succeed because plaintiff

admitted at his deposition that he obtained the first cost data under false pretenses.  Plaintiff

argues that defendants have not asserted that plaintiff secured the data by "improper means" as

defined in the PUTSA.

To establish misappropriation by acquisition under the PUTSA, defendants must establish

"acquisition of a trade secret of another by a person who knows or has reason to know that the

trade secret was acquired by improper means."  12 Pa. C.S.A. § 5302(1).  The PUTSA defines

"improper means" as "[i]nclud[ing], but []not limited to, theft, bribery, misrepresentation, breach

---

    [9]  Plaintiff argues that the PUTSA claim (Count 8) only includes an allegation based on his disclosure, not on his acquisition of the first cost data.  However, Count 8 alleges that plaintiff misappropriated David's Bridal's trade secrets and, while it specifically mentions the facts behind the disclosure in the Count 8 section, it "repeat[s] and re-allege[s] the foregoing paragraphs of this [c]ounterclaim as it set forth at length herein" which includes references to plaintiff's acquisition of the first cost data.

    [10]  Defendants state in their supplemental filing that, regardless of the date of disclosure, the misappropriation should be deemed to have occurred when plaintiff admittedly obtained the first cost data.  However, I will address their claims under both theories of misappropriation.

or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other

means."  12 Pa. C.S.A. § 5302.

Defendants argue that the misappropriation occurred when plaintiff obtained the first cost

data by improper means when he requested it under false pretenses.  Defendants note that

plaintiff testified that when he asked for the information from Chow he told her that he wanted

the information to "make sure that the costs were in line at that time."   Plaintiff admitted that he

had never before made a request for the first cost data for every dress that was going to be in a

particular line and had never before had Chow annotate the bridal catalog with costs.

Additionally, plaintiff admitted that he asked for the information because Erlbaum "had asked

[him] to - - how much things cost, and [he] really had no idea.  So [he] wanted to get an idea of

what we were paying for the dresses."  Plaintiff also admitted in his affidavit that he requested

the first cost data because Erlbaum "had expressed an interest in establishing a wholesale dress

manufacturing business in an off-shore location and was interested in what David's Bridal paid

various manufacturers for the dresses they manufactured."  Defendants also argue that plaintiff

had requested the information from Shaps-Shanin and Zuk before obtaining it from Chow but

that they had refused to give it to him, but plaintiff disputes that these requests were made.  The

jury could infer from the above conflicting evidence that, because plaintiff admitted that Erlbaum

expressed interest in the information to him and he was denied the information when he

requested it from other sources, the reason that he provided to Chow for why he wanted the

information was a misrepresentation satisfying the PUTSA "improper means" requirement.

Because this is an inference for the jury to make, defendants have provided sufficient evidence to

survive summary judgment but have not shown that no genuine issue of material fact exists as to

this issue.  Thus, I will deny defendants' and plaintiff's cross-motions for summary judgment on defendants' PUTSA counterclaim for misappropriation by acquisition of the first cost data.

      B.     Misappropriation by Disclosure

Plaintiff argues that defendants have failed to state a claim for misappropriation by disclosure because he did not disclose the information to Erlbaum while employed by defendants. Plaintiff suggests that this claim can only be asserted by David's Bridal because only David's Bridal had an interest in the first cost data when it was disclosed.  Defendants argue that plaintiff should not be rewarded for his prevarication with respect to the timing of his disclosure to Erlbaum when he has admitted that he disclosed the information.

To establish misappropriation by disclosure under the PUTSA, defendants must establish that plaintiff disclosed their trade secret without express or implied consent and either:

> (i) used improper means to acquire knowledge of the trade secret;
> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
> > (A) derived from or through a person who had utilized improper means to acquire it;
> > (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> > (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12 Pa. C.S.A. § 5302.

First, I must determine whether defendants can allege a misappropriation by disclosure claim as plaintiff argues that David's Bridal is the only party that could bring such a claim. Defendants argue that the disclosure occurred in the last week of January 2007 as plaintiff admits that he met with Erlbaum and Shaps-Shanin during this time.  Defendants argue that it is

inconceivable that plaintiff did not disclose the information to Erlbaum at his meeting with him shortly after he acquired the data when he admits Erlbaum had inquired about the data prior to his acquiring it.  Plaintiff argues that the only evidence of disclosure is his admission that he disclosed the first cost data after his surgery in February 2007 when his employment agreement had been assigned to David's Bridal.  However, during his deposition, plaintiff testified that he could not recall when he disclosed it and, in a recent filing, he claimed that he disclosed it after his employment with David's Bridal ended.  Based on plaintiff's conflicting testimony and defendants' evidence that plaintiff met with Erlbaum after acquiring the first cost data, a jury could infer that plaintiff made the disclosure while employed by defendants.  Thus, a genuine issue of material fact exists as to when the first cost data was disclosed to Erlbaum.

Even if it were clear that the disclosure occurred while plaintiff was employed by defendants, I would still need to determine whether defendants have provided sufficient evidence to establish that plaintiff misappropriated the first cost data by disclosing it under 12 Pa. C.S.A. § 5302(2)(I), § 5302(2)(ii) or § 5302(2)(iii).  It is as yet unclear under which sub-provision for showing misappropriation by disclosure defendants are pursuing their claim because they have failed fully to brief this issue, but they need only satisfy one sub-provision of § 5302(2) for their disclosure claim.  As I previously noted, there is a genuine issue of material fact as to whether the trade secret was acquired through improper means.  If it was acquired through improper means, plaintiff would satisfy the requirement that he be a person who disclosed after using improper means to acquire knowledge of the trade secret.  Thus, there is a genuine issue of material fact as to whether plaintiff misappropriated the data by disclosing it under 12 Pa. C.S.A. § 5302(2)(i). As I find that a genuine issue of material fact exists under § 5302(2)(i) for defendants to survive

summary judgment on their misappropriation by disclosure claim, I need not determine whether a claim for misappropriation by disclosure would also exist under § 5302(2)(ii) or § 5302(2)(iii). The parties did not brief the specifics of these provisions and regardless of whether defendants could show that no genuine issue of material fact exists with regard to provision § 5302(2)(ii) or § 5302(2)(iii) a genuine issue of material fact would still exist as to the timing of the disclosure, preventing me from granting summary judgment in defendants' favor on their misappropriation by disclosure claim. Additionally, plaintiff asserts that, even if he disclosed the first cost data while employed by defendants, there is no evidence that he disclosed the first cost data to Erlbaum with full knowledge that it constituted a trade secret which would likely create a genuine issue of material fact under these provisions as well.

Defendants have thus provided sufficient evidence to survive summary judgment but have not shown that no genuine issue of material fact exists as to this issue. Therefore, I will deny both defendants' and plaintiff's cross-motions for summary judgment on defendants' PUTSA counterclaim for misappropriation by disclosure of the first cost data.

III.   Defendants' Requested Damages and Relief

Defendants seek injunctive relief, compensatory damages, exemplary damages, attorneys' fees, expenses and costs, declaratory relief and an extension of the employment agreement.

A.   Injunctive Relief

Defendants seek injunctive relief against plaintiff to prevent him from any future use or disclosure of the first cost data.

A preliminary injunction is an extraordinary remedy that should be granted only if a party shows:  (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable

harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.  Kos Pharms. Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004).  A party's failure to establish any element in its favor renders a preliminary injunction inappropriate.  Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.,  306 Fed. Appx. 727, 732 (3d Cir. 2009), citing Nutrasweet Co. v. Vit-Mar Enters., Inc., 176 F.3d 151, 153 (3d Cir. 1999).  "A failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction."  Ace Am. Ins. Co., 306 Fed. Appx. at 732, citations omitted.  "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will."  Kos Pharms., 369 F.3d at 726, quoting Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998)).

Defendants "seek injunctive relief against plaintiff to the extent plaintiff is deemed to have misappropriated the first cost data prior to the January 31, 2007 assignment of the 2001 employment agreement to David's Bridal and the sale by Macy's of David's Bridal to Leonard Green & Partners" and "insist that they have a stake in assuring that the employment agreement, which accorded [plaintiff] substantial benefits and compensation, be upheld.  Defendants retain an interest in assuring compliance with the no disclosure and related confidentiality provisions of the [a]greement."  Defendants also seek injunctive relief for the current benefit of David's Bridal in keeping with provision 11 of the employment agreement which states that the agreement "will inure to the benefit of, and will be binding upon May, its successors and assigns."  Defendants claim that, because they remained potentially obligated under the employment agreement should David's Bridal have failed to meet its obligations to [plaintiff], defendants retain an interest in preventing the waste of David's Bridal's assets and in seeking continued enforcement of

plaintiff's obligations under the agreement.  Additionally, defendants note that, under the stock purchase and plan of merger agreement, Macy's looked to David's Bridal to defend and indemnify it in this litigation.

However, defendants no longer own the first cost data at issue in this litigation and so can show no harm to them from any future use or disclosure by plaintiff and/or Erlbaum.  Only David's Bridal can seek to demonstrate potential irreparable harm to its reputation, good will, and trade if plaintiff uses or discloses the first cost data.[11]  Additionally, defendants' argument that it has an interest in such injunctive relief to prevent a waste of David's Bridal's assets and its ability to fulfill its obligations because defendants are obligated to plaintiff under the employment agreement if David's Bridal is unable to fulfill its obligations is without merit.  Plaintiff's employment agreement with David's Bridal has terminated, ending any future requirement to fulfill David's Bridal's failed obligations to plaintiff that defendants claim they have under the agreement.  As defendants can show no potential injury, much less irreparable harm, to themselves should plaintiff use or disclose this data, I will grant plaintiff's motion for summary judgment on defendants' request for injunctive relief to prevent plaintiff from any future use or disclosure of the first cost data.

Defendants also request that I enjoin plaintiff from "working for any company in the bridal industry, where his position would involve likely disclosure of David's Bridal's Protected Information" pursuant to 12 Pa. C.S.A. § 5303(c).  Defendants further request that I order plaintiff "to return to David's Bridal all of David's Bridal's Protected Information in his

---

[11]  By stating that David's Bridal and not defendants have this interest, I make no finding as to the merits of any claim David's Bridal may pursue.

possession, including but not limited to any and all information [plaintiff] copied, retained, or took from David's Bridal" pursuant to 12 Pa. C.S.A. § 5303(c).  Section 5303(c) states that "[i]n appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order."  As in defendants' request for injunctive relief to prevent plaintiff's future use and disclosure of the first cost data, defendants fail to provide any evidence of a protectable interest they have in such relief.  Thus, I will grant plaintiff's motion for summary judgment on these requests for injunctive relief.

 B. <u>Damages under the PUTSA</u>

 Defendants request compensatory damages, unjust enrichment, exemplary damages and attorneys' fees, expenses and costs.

 The PUTSA creates a statutory cause of action for injunctive relief, compensatory damages and exemplary damages for the actual loss caused by misappropriation of trade secrets and the unjust enrichment caused by such misappropriation in addition to attorneys' fees and costs.  12 Pa. C.S.A. §§ 5303-5.  As I have previously found that defendants are not eligible to receive injunctive relief, I will address only defendants' requests for compensatory and exemplary damages and attorneys' fees and costs under the PUTSA.  Defendants claim that they are entitled to such relief if they are successful on their PUTSA claims.  Plaintiff claims that they are not.

 1. <u>Compensatory Damages</u>

The PUTSA states that:

Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation.  Damages

25

can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.  In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

12 Pa. C.S.A. § 5304

Plaintiff argues that there is no evidence that defendants have suffered any actual loss as a result of plaintiff securing the first cost data or providing it to Erlbaum.  Specifically, plaintiff argues that defendants are requesting compensatory damages for unproven and unspecified harm to non-party David's Bridal.  While defendants admit that actual harm and/or loss to defendants is difficult to calculate, they argue that the evidence of some damages is clear.

Defendants argue that they have been required to undertake considerable time and expense to defend against plaintiff's claims when his competitive misconduct would operate as a bar to such claims.  However, this is irrelevant to their claim of damages under the PUTSA for misappropriation of a trade secret.

Defendants also argue that they have damages stemming from the time that plaintiff spent in their employ from late December 2006 through the sale of David's Bridal during which he allegedly violated the employment agreement by recruiting an employee to work with him and Erlbaum in a competing venture and by acquiring the first cost data.  Defendants allege he spent time traveling to Houston at defendants' expense to meet with Linda Shaps-Shanin, time soliciting information to procure the first cost data from Shaps-Shanin and her assistant, Sharon Zuk, time traveling to Hong Kong via London and insisting Shaps-Shanin meet with Carol Li a prospective designer, and time spent in Hong Kong when he traveled there for the purpose of obtaining the first cost data.  Thus, defendants argue that their actual losses include the full value

of plaintiff's salary for the months of December 2006, January 2007 and February 2007 as well

as reimbursement of these three business trips when he used the trips to help procure proprietary

information and the first cost data, totaling $73,750.  However, this does not take into account

my June 5, 2009 Memorandum finding that plaintiff did not forfeit his entire salary for this

period or need to reimburse defendants for the entire expense of the trips as defendants only

provide evidence of harm for the portion of his salary attributed to time he spent obtaining the

first cost data.  Youtie, 626 F. Supp. 2d at 527, citing Fidelity Fund, Inc. v. Di Santo, 500 A.2d

431, 440 (Pa. Super. Ct. 1985).   Defendants have not presented any additional information in

their second motion for summary judgment or supplemental briefing regarding plaintiff's

conduct during this time period to support their request for reimbursement of plaintiff's entire

salary or travel expenses for these months.  At trial, defendants must submit evidence to the jury

on their damages regarding the discrete time periods that plaintiff allegedly engaged in the

activities at issue and plaintiff may provide evidence to dispute the damages.

     Additionally, defendants argue that any actual harm incurred by defendants from use of

the first cost data is unknown because plaintiff has asserted several statements as to what the

information was to be used for, including a wholesale bridal operation to be owned and run by

Erlbaum.  Defendants claim that they cannot calculate the loss of potential revenue because

plaintiff must disclose in a hearing the extent of his use of the information and the full list of

people to whom he disclosed it.  Defendants also request that plaintiff disclose any benefit that he

received as an alternative way to calculate damages.  Discovery has closed, plaintiff has been

deposed and defendants have presented no evidence that plaintiff has made any use of the first

cost data apart from his disclosure to Erlbaum.  Without such evidence, a hearing to determine

the extent of the use of the information is not necessary.

Defendants argue that, in the absence of actual damages, the PUTSA provides that defendants may receive a "royalty for a misappropriator's disclosure and use," suggesting that an appropriate measure for royalty damages would be a percentage of the monies that defendants invested to develop the first cost data. Plaintiff argues that a request for royalties to be paid to non-party David's Bridal for plaintiff's unspecified unjust enrichment is improper. I agree that defendants cannot pursue royalties for David's Bridal and can only pursue royalties on their own behalf.

2.     Exemplary Damages

Defendants argue that they are entitled to exemplary damages. The PUTSA states that "[i]f willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a) [that of monetary damages]." 12 Pa. C.S.A. § 5304. Defendants argue that the factual record warrants such an imposition based upon their allegation that plaintiff took advantage of his position to acquire the first cost data and his candid admission that he disclosed it.

However, plaintiff argues that provision 8(d) of the employment agreement explicitly precludes a claim for exemplary damages in any legal proceedings. Provision 8(d) states: "[i]f any legal proceeding is instituted, neither you nor May will be entitled to seek or obtain punitive or exemplary damages of any kind from the other or, in your case, from May's subsidiaries or divisions . . . ."

As I previously found, in keeping with the forum choice provision in the contract, the employment agreement at issue is governed by Missouri law. Youtie, 626 F. Supp. 2d at 518 n.4.

28

"The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention."  Boyer v. Sinclair & Rush, Inc., 67 S.W.3d 627, 631 (Mo. App. E.D. 2002), citing Edgewater Health Care Inc. v. Health Sys. Mgmt, Inc., 752 S.W.2d 860, 865 (Mo. App. 1988).  "Where there is no ambiguity in the contract, the intentions of the parties are to be ascertained from the language of the contract and nothing else and it is the duty of the court to state its clear meaning."  Id.  Both Missouri and Pennsylvania law enforce limitation of liability clauses between sophisticated parties to the extent that they are reasonable and do not completely exonerate parties from liability for gross negligence or intentional acts, regardless of whether the damages are pled in contract or in tort.  See Alack v. Vic Tanny Int'l of Missouri, Inc., 923 S.W.2d 330, 337 (Mo. 1996); Advanced Tubular Products, Inc. v. Solar Atmospheres, Inc., 2004 WL 540019, at *4 (E.D. Pa. Mar. 12, 2004).

Provision 8(d) explicitly and in clear language precludes the recovery of exemplary damages in any litigation between defendants and plaintiff.  Here, both parties are sophisticated and the limitation of liability is reasonable in that it does not bar all liability, merely exemplary and punitive damages.  Thus, defendants are not entitled to exemplary damages.  Plaintiff's motion for summary judgment on defendants' request for exemplary damages will be granted.

### 3.   Attorneys' Fees, Expenses and Costs

Additionally, defendants move for attorneys fees under the PUTSA and Federal Rule of Civil Procedure 54.  The PUTSA permits the court to "award reasonable attorney fees, expenses and costs to the prevailing party:  (1) if a claim of misappropriation is made in bad faith; (2) a motion to terminate an injunction is made or resisted in bad faith; or (3) willful and malicious misappropriation exists."  12 Pa. C.S.A. § 5305.  The PUTSA defines willful and malicious as

29

"[s]uch intentional acts or gross neglect of duty as to evince a reckless indifference of the rights

of others on the part of the wrongdoer, and an entire want of care so as to raise the presumption

that the person at fault is conscious of the consequences of his carelessness."  12 Pa. C.S.A. §

5302.

Defendants claim that plaintiff's alleged misappropriation of the first cost data was an

"abject disregard" of his duty to refrain from misappropriating trade secrets and therefore willful

and malicious.  At this time, whether plaintiff's actions constitute misappropriation at all, much

less a willful and malicious misappropriation, is a genuine issue of material fact for the jury to

determine.  However, defendants have alleged sufficient facts to create a genuine issue of

material fact as to whether, in making the alleged misappropriation, plaintiff's actions were

intentional or recklessly indifferent to David's Bridal's rights to the first cost data, sufficient to

raise a presumption that he was conscious of the consequences of his actions.  Thus, defendants

may be entitled to attorneys' fees, expenses and costs under the PUTSA.  I will therefore deny

plaintiff's motion for summary judgment on defendants' request for such relief under the

PUTSA.

However, as previously addressed in my August 31, 2009 Memorandum denying

defendants' request for attorneys' fees and costs and for the same reasons discussed therein,

defendants are not entitled to attorneys' fees and costs under Rule 54 for their counterclaims.

C.    Declaratory Relief

Defendants seek "declaratory relief that the first cost data constitutes a trade secret as

such ruling would relate directly to their defense [that plaintiff is not entitled to enforce the

contract because he breached it first] and facilitates the complete and timely resolution of the

30

case."  Thus, "if plaintiff is deemed to have misappropriated defendants' trade secrets under the PUTSA, such a finding is further evidence that Youtie has violated his obligations to faithfully and diligently perform his duties, avoid conflicts of interests, and to maintain the company's trade secrets."  Defendants claim that it is therefore "appropriate to permit [them] to seek a declaratory ruling that the first cost data is a trade secret and the acquisition and disclosure of the data to Erlbaum operates to bar any recovery to plaintiff under the employment agreement."  Defendants argue that they have standing to seek a declaratory ruling that the first cost data is a trade secret under the PUTSA and that plaintiff misappropriated that data because it operates as a complete defense to plaintiff's affirmative claims against defendants and such a declaration is further evidence of his breach of the employment agreement.  Defendants request such a declaration to bar plaintiff's claims as it directly relates to their defense to plaintiff's original claims and facilitates the complete and timely resolution of the case.  Additionally, in their complaint, defendants request that the court issue a judicial declaration that the 2001 employment agreement was properly and legally assigned.

I will deny defendants' requests for declaratory relief as I have already disposed of plaintiff's claims on other grounds that avoid making the determinations necessary for such relief.  Deciding on alternative grounds is therefore unnecessary to bar plaintiff's claims.  I will therefore grant plaintiff's motion for summary judgment on defendants' requests for declaratory relief.

D.      Extension of the Confidentiality Agreement

Defendants request an order declaring an extension to the restrictions set forth in provision 5 of the employment agreement which states that for one year after his employment

terminates, plaintiff cannot compete with David's Bridal or solicit a David's Bridal employee for employment.  Defendants argue that plaintiff has admitted that he obtained and disclosed the first cost data to someone who planned to compete with David's Bridal and they claim that he tried to entice Shaps-Shanin to leave David's Bridal and go with him and Erlbaum to a competing venture.  Defendants request that the one-year period be extended to one year from the date of my June 5, 2009 Order finding that plaintiff violated the employment agreement or one year from the date of my Order deciding this motion because they did not get the benefit of the restriction and the employment agreement expressly provides at paragraph 5(e) that a period during which he was in violation of the restrictions "will not be counted in determining the time during which the restrictions apply."

However, as previously noted, defendants no longer own the first cost data at issue; instead, it is owned by David's Bridal.  Further, defendants assigned plaintiff's employment agreement to David's Bridal.  Thus, defendants have not shown that they have a protectable interest in extending the covenant not to compete for a year.  I will therefore deny defendants' motion to extend the confidentiality agreement for one year and grant plaintiff's motion for summary judgment on such a request.

An appropriate Order follows.